UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY HECKENBACH, ) | |
| ) | |
| Plaintiff, ) | Case No. 19-cv-2877 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| BLOOMINGDALE FIRE PROTECTION ) | |
| DISTRICT; JEFFREY JANUS, in his ) | |
| individual and official capacity; DONALD ) | |
| KADERABEK, in his individual and ) | |
| official capacity; and CHRISTOPHER ) | |
| WILSON, in his individual and official ) | |
| capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory Heckenbach has served his community and his country for more than a decade. He is a firefighter and paramedic in the Village of Bloomingdale, where he has protected the public for fourteen years. He is also a member of the U.S. military. But he can't be two places at once, and sometimes his service to the local government has conflicted with his service to the federal government.

Heckenbach's military service has led to tension with the Fire Department, and then some. As the complaint tells it, the Fire Department is engulfed by "anti-military animus." *See* Cplt. ¶¶ 14, 19, 56, 57, 59, 72, 79, 82, 119, 129 (Dckt. No. 1). Heckenbach claims that the Fire Department and its leadership were "hostile, defiant, confrontational, and antagonistic" to his military service. *Id.* at ¶ 2.

According to the complaint, the Fire Department and its management refused to fully compensate him for time devoted to military duty. They refused to grant him leave for military

training, requiring him to spend vacation time or find another firefighter to cover his shifts. He also suffered through a campaign of "hostility and harassment," which sparked screaming and physical intimidation, and nearly led to blows. *Id.* at ¶¶ 90, 91, 93. The hostility left the firehouse, too, when Heckenbach's superiors contacted the military to smear his reputation.

Heckenbach ultimately filed a five-Count complaint against the Bloomingdale Fire Protection District (the "District," or the "Fire Department") and three of its leaders. Defendants responded by filing a motion for judgment on the pleadings on two of the five Counts. For the reasons stated below, the Court grants the motion.

## Background

On a motion for judgment on the pleadings, the Court must take the well-pleaded allegations of the complaint as true. *See Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 400 (7th Cir. 2018). All reasonable inferences flow in the plaintiff's favor. *Id.*

In 2006, Heckenbach became a firefighter and paramedic for the District in the Village of Bloomingdale, Illinois. *See* Cplt. ¶¶ 10, 24 (Dckt. No. 1). He's an active participant. He has served on the Fire Investigation and Hazmat Team, and he currently coordinates the Honor Guard and contributes to the Water Rescue Team. *Id.* at ¶ 33. He has received a number of certifications, too, including Firefighter III, Firefighter Rescue Technician, Vehicle Machine Operator, Vehicle Machinery Technician, and Fire Investigator. *Id.* at ¶ 32. He has satisfactorily performed his duties. *Id.* at ¶ 35.

Heckenbach is also a non-commissioned officer in the United States Army Reserve, holding the rank of Staff Sergeant. *Id.* at ¶¶ 10, 25–26. The Army calls him up for active duty from time to time, which interferes with his civilian responsibilities. *Id.* at ¶¶ 37, 43. For example, he answered the call and guarded terrorists during their prosecutions at Guantanamo Bay, Cuba. *Id.* at ¶¶ 11, 38.

The military service requires regular training – one weekend a month, plus two weeks a year. *Id.* at ¶ 36. But his military obligations are not a surprise to the Fire Department. The Army Reserve publishes its monthly training schedule one year in advance, and Heckenbach provided that training schedule to the District. *Id.* at ¶¶ 44–47. So, the Fire Department knew in advance when Heckenbach would have to miss work to serve his country. *Id.* Sometimes he needed to perform additional military duties, too, often with short notice from the Army Reserve. *Id.* at ¶ 37.

Military training can create scheduling issues. Like most fire departments, the District operates a shift schedule of 24 hours on duty, followed by 48 hours off duty, which requires advance planning. *Id.* at ¶ 31. But the District was ill-prepared to address the challenges posed by an employee with military duties. The District had no military leave policy, and it showed. *Id.* at ¶¶ 50–51.

Starting in 2012, the District required Heckenbach to bear the cost of his training by denying him military leave. *Id.* at ¶ 13. Between August 2012 and October 2014, the District forced him to use vacation days (or other days off), or trade shifts with another firefighter, to cover his military leave. *Id.* at ¶ 52. He used vacation days to cover his weekend military drills from November 2015 to March 2017. *Id.* at ¶ 54. All told, he spent 20 vacation days to cover his military training from 2012 to 2017, resulting in a loss of more than $15,000 in accrued vacation wages. *Id.* at ¶¶ 55, 68, 70.

The District also dragged its heels paying Heckenbach when he took time off for military service. It began in September 2015, after he returned from Guantanamo Bay. Heckenbach worked for the District only nine days that month. *Id.* at ¶¶ 38–39. The District "initially" didn't want to pay his full compensation for those nine days. *Id.* at ¶ 40; *see also id.* at ¶ 12. Worse

3

yet, Defendant Christopher Wilson – a Battalion Chief at the District and Heckenbach's direct supervisor – told Heckenbach that those nine days were "voluntary" and "not deserving of compensation." *Id.* at ¶¶ 30, 41. But Defendants ultimately agreed to pay him after he asserted his rights as a member of the military. *Id.* at ¶ 42.

Tensions escalated. Defendants accused Heckenbach of being less than candid about his upcoming military training schedule. *Id.* at ¶¶ 48–49. They claimed that he failed to give enough notice. *Id.* at ¶ 49. So, they began to impose "detailed, demanding, and changing requirements" to show that he was, in fact, attending military training. *Id.* at ¶¶ 56–57.

The annual schedule from the Army Reserve wasn't good enough. *Id.* at ¶¶ 14, 56. Defendants demanded to see all sorts of paperwork, such as his monthly Leave and Earning Statements (*i.e.,* military pay voucher), Defense Finance and Accounting Service records, orders from his Army Reserve Unit, an "employer letter" to verify military duty, a Departmental leave slip, pre-deployment checklists, Battle Assembly schedule, and other documentation. *Id.* They required "substantial paperwork" and "unrealistic amounts of advance notice." *Id.* at ¶ 14.

By demanding supporting documents, Defendants treated Heckenbach as a "deceitful, disobedient, insubordinate" employee. *Id.* at ¶ 57. Defendant Jeffrey Janus, the Fire Chief for the District, would sometimes refuse to approve military leave unless Heckenbach turned over certain records. *Id.* at ¶¶ 28, 58. Janus also told another firefighter to "keep an eye on" Heckenbach, which made him feel isolated. *Id.* at ¶ 59.

Defendants heaped on the abuse, and made things difficult for Heckenbach. *Id.* at ¶ 48. In March 2017, Janus – again, the Fire Chief – told Heckenbach that he could approve military leave only upon receipt of orders signed by the President of the United States. *Id.* at ¶ 61. He

4

also demanded 30 days advance notice, and asserted a right to call the Army Reserve at any time and say that Heckenbach was needed at the firehouse. *Id.* at ¶¶ 64, 66.

In April 2017, Heckenbach submitted paperwork to request military leave for his annual summer training. *Id.* at ¶ 73. He received more opposition. Janus responded that the Fire Department wouldn't pay him unless he found someone to cover his shifts. *Id.* at ¶ 74. Janus later said that he would pay Heckenbach only if he forwarded his military pay to the District and arranged his own time off for weekend drills. *Id.* at ¶ 76.

Heckenbach ultimately attended the two-week military training in the summer of 2017. *Id.* at ¶ 78. But he did not receive full compensation from the Fire Department. *Id.*

The situation continued to deteriorate. In January 2018, Defendants contacted Heckenbach's superiors in the Army Reserve, and smeared him. *Id.* at ¶¶ 17, 82–88. They made a series of false and misleading statements about him, and did so to damage his reputation. *Id.* at ¶¶ 6, 17. They called him a "problem," and characterized him as "disobedient," "late," "insubordinate," and "dishonest." *Id.* at ¶ 6. They said that he was "less than truthful" and "failed to follow procedure." *Id.* at ¶ 17.

Defendants complained that Heckenbach was breaking the rules and had been a "problem" for years. *Id.* at ¶ 86. Defendant Kaderabek (the Deputy Chief) wrote to the Army Reserve, complained that Heckenbach wasn't providing enough notice about his military training, and threatened discipline. *Id.* at ¶¶ 83–84. Defendant Christopher Wilson (the Battalion Chief) sent texts to Heckenbach's military chain of command, explaining that Wilson was "[t]rying to light a fire under his a\*\*." *Id.* at ¶ 85.

In January 2018, Defendants arranged a conference call with Heckenbach's military superiors to discuss his failure to notify the Fire Department about the training schedule. *Id.* at

5

¶¶ 87–89. After the call, Kaderabek (again, the Deputy Chief) confronted Heckenbach, telling him that leadership of the District was "tired of your sh**." *Id.* at ¶ 89. He added: "We've been putting up with your sh** for over a year. The chief has done nothing but bend over backwards for you and all you want to do is f*** around. These f***ing games are going to stop." *Id.*; *see also id.* at ¶ 3.

Heckenbach felt physically intimidated, too. *Id.* at ¶ 90. Kaderabek (and perhaps other Defendants) cornered him, yelled at him, and physically towered over him. *Id.*; *see also id.* at ¶ 18 (referring to "Defendants"); *id.* at ¶ 3 (referring to "Some" Defendants). Kaderabek screamed: "Look up and look at me. You little f***ing pimp." *Id.* at ¶ 90.

The "entire firehouse heard the screaming." *Id.* at ¶ 18. The situation "nearly resulted" in Kaderabek "physically striking" Heckenbach. *Id.* at ¶ 91.

Heckenbach filed a grievance with his local union in February 2018. *Id.* at ¶ 92. But the grievance only stoked the flames, and the harassment continued. *Id.* at ¶ 93. Defendants stigmatized Heckenbach as an "outsider, a pot-stirrer, a trouble-maker." *Id.* at ¶ 95. They labeled Heckenbach a "problem-child," which "resulted in his becoming ostracized and not trusted as a team player, something that can prove fatal for a firefighter." *Id.* at ¶ 19.

In August 2018, Heckenbach requested back pay from 2014 through 2018. *Id.* at ¶ 96. He calculated that he was entitled to more than $27,000 in back pay, above and beyond the lost vacation time. *Id.* at ¶ 99; *see also id.* at p.21 ("RELIEF SOUGHT").

Heckenbach calculated the back pay under the Illinois Military Leave of Absence Act (or "IMLOAA"). The IMLOAA governed during period in question, but was later repealed and replaced by the Illinois Service Member Employment and Reemployment Rights Act (or "ISERRA"). The IMLOAA required public employers to give their employees differential pay

for days worked in the military that they otherwise would have worked for their employer. *See* 5 ILCS 325/1(a) (repealed 2019); *cf.* 330 ILCS 61/1-10 (defining "differential compensation" as "pay due when the employee's daily rate of compensation for military service is less than his or her daily rate of compensation as a public employee") (quoting the current statute, the ISERRA). In other words, if a service member earned less from his military position than he would have earned in his regular job, his public employer had to cover the difference.

Heckenbach calculated backpay using the same formula as other local entities, such as the Chicago Police Department. *Id.* at ¶ 98. But the complaint alleges that Defendants "did not follow the proper calculations as set forth in the IMLOAA." *Id.* at ¶ 97. So Defendants refused his request for backpay. *Id.* at ¶ 101.

Overall, Heckenbach alleges that animosity toward military service was a "motivating factor in Defendants' decisions to deny his compensation, create unlawful demands for military leave paperwork and notice, and to discriminate and retaliate against [him], to harass, intimidate, and ostracize him at work, to include repeatedly defaming him to the United States Army Reserve and within the Fire Protection District." *Id.* at ¶ 102.

Heckenbach ultimately filed a five-Count complaint against the Bloomingdale Fire Protection District, as well as Chief Janus, Deputy Chief Kaderabek, and Battalion Chief Wilson. Count I is a claim for differential pay under a federal statute, the Uniformed Services Employment and Reemployment Rights Act (the "USERRA"). *Id.* at ¶¶ 104–110. Counts II and III are under the same federal statute. Count II is a disparate treatment discrimination and retaliation claim, and Count III is a hostile work environment claim. *Id.* at ¶¶ 110–131.

The last two claims arise under state law. Count IV is a claim for differential pay under the Illinois Military Leave of Absence Act. *Id.* at ¶¶ 132–136. Finally, Count V is a claim of defamation per se. *Id.* at ¶¶ 137–147.

Defendants responded by filing a motion for judgment on the pleadings on the federal claim for differential pay under USERRA (Count I), and the defamation claim (Count V). Defendants do not challenge the other three Counts, including the claim for differential pay under state law.

## Legal Standard

A party may move for judgment on the pleadings any time after the pleadings are closed. *See* Fed. R. Civ. P. 12(c); *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). The standard is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1092 (7th Cir. 2018). "To survive a motion for judgment on the pleadings, a complaint must state a claim to relief that is plausible on its face." *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (cleaned up).

The Court takes all well-pleaded facts as true. *See Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). And the Court "view[s] the facts in the complaint in the light most favorable to the nonmoving party and will grant the motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Denan*, 959 F.3d at 293 (cleaned up); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1368 (3d ed. 2020) ("[A]ll of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false.").

"[A] complaint that alleges an impenetrable defense to what would otherwise be a good claim should be dismissed (on proper motion) under Rule 12(c)." *Richards v. Mitcheff*, 696 F.3d

8

635, 637–38 (7th Cir. 2012). But the defense must be "impenetrable." *Id.* Judgment on the pleadings is proper only if plaintiff's allegations "show that there is an airtight defense [such that he] has pleaded himself out of court." *Id.* That is, it must be "beyond doubt" that the plaintiff cannot prevail. *Denan*, 959 F.3d at 293 (quoting *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)); *see also Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 658 F.3d 662, 665 (7th Cir. 2011) ("When the complaint itself contains everything needed to show that the defendant must prevail on an affirmative defense, then the court can resolve the suit on the pleadings under Rule 12(c).") (citation omitted).

## Analysis

Defendants move for judgment on the pleadings on two claims: the differential pay claim under the USERRA (Count I), and the defamation claim under state law (Count V). On Count I, they argue that federal law does not create a right to differential pay. On Count V, they assert immunity under the Illinois Local Government and Governmental Employees Tort Immunity Act. *See* 745 ILCS 10/1-101 *et seq.* The Court will address each Count in turn.

**I.      The Differential Pay Claim under the USERRA (Count I)**

Congress enacted the USERRA to "encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service." *See* 38 U.S.C. § 4301(a)(1). "Enacted in 1994, USERRA is the most recent iteration of a series of laws dating back to 1940 intended to protect the employment and reemployment rights of members and former members of the armed forces." *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). The Act "prohibit[s] discrimination against persons because of their service in the uniformed services." *See* 38 U.S.C. § 4301(a)(3).

9

The Act contains an anti-discrimination provision that protects "any benefit of employment." *Id.* at § 4311(a); *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009) ("USERRA affords broad protections to service members against employment discrimination."). "A person who is a member of . . . a uniformed service shall not be denied . . . any benefit of employment by an employer on the basis of that membership . . . or obligation." *See* 38 U.S.C. § 4311(a). A "benefit of employment" is "any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement." *Id.* at § 4303(2).

Heckenbach alleges that Defendants violated the anti-discrimination provision by failing to provide differential pay. *See* Cplt. ¶¶ 104–110. That is, he seeks to recover the delta between what he received from his military service, and what he would have received if he had worked for the Fire Department on the days in question. In his view, the District has a statutory obligation under federal law to make up the difference.

Heckenbach doesn't allege that he received no pay for his time. He appears to acknowledge that he received *some* differential pay. But he seems to argue that the Fire Department calculated differential pay the wrong way. The complaint alleges that Defendants "incorrectly calculated his Differential Pay while on Active and Inactive Duty." *Id.* at ¶ 96; *see also id.* at ¶ 97 ("Defendants did not follow the proper calculations as set forth in the IMLOAA."); *id.* at ¶ 108 (alleging that Defendants did not "properly" compensate him). He brings a claim under the USERRA to recover the full amount of differential pay, claiming that it is a "benefit of employment" under the federal statute. *Id.* at ¶ 107.

Seventh Circuit precedent forecloses Heckenbach's federal claim. Unlike state law, the USERRA does not require the District to provide differential pay at all. The "USERRA

10

prohibits discrimination by, among other things, denying any benefit of employment on the basis of the employee's membership in the uniformed services. It does not expressly require paid military leave." *Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7th Cir. 2017).

The Seventh Circuit squarely addressed this question in *Gross v. PPG Industries, Inc.*, 636 F.3d 884 (7th Cir. 2011). In *Gross*, the plaintiff brought a claim for differential pay under the Act for his tour of duty with the Marines in Iraq. He sought to recover the difference between his military pay and what he would have received if he had remained at his company. The District Court granted summary judgment to the employer, concluding that the employer "had no obligation to offer differential pay" because "differential pay is not a benefit of employment under USERRA." *Id.* at 887. The Seventh Circuit affirmed.

The Court of Appeals expressly rejected the notion that the USERRA "requires employers to provide its military employees benefits, *like differential pay*, that exceed those benefits offered to its other employees generally." *Id.* at 889 (emphasis added). The Seventh Circuit reasoned that section 4311 is an anti-discrimination provision, which "serves to protect military employees from discrimination," but does "not provide them with preferential treatment." *Id.* at 890. "[A]s an anti-discrimination provision," section 4311 "protect[s] only those benefits of employment provided to both military and non-military employees." *Id.* at 889. Differential pay for military service wasn't provided to *non*-military employees, so it wasn't a benefit of employment within the meaning of the statute. *Id.*

The Seventh Circuit drew upon a string of cases holding that the Act requires equal treatment, but not preferential treatment. *Id.* at 889–90. For example, in *Crews v. City of Mt. Vernon*, 567 F.3d 860 (7th Cir. 2009), the Seventh Circuit ruled that a city's decision to "provide equal work scheduling benefits to all employees does not violate USERRA." *Crews*, 567 F.3d at

11

866. The statute did not require a "preferential work scheduling policy" that "was not [] generally available to all employees." *Id.*; *see also id.* ("[C]ourts have indicated that the statute reaches only discriminatory employment actions that provide military employees with fewer benefits."); *Sandoval v. City of Chicago*, 560 F.3d 703, 705 (7th Cir. 2009) ("A requirement of equal treatment is incompatible with a demand for preferential treatment.").

Heckenbach, for his part, doesn't address *Gross* at all. *See* Pl.'s Resp. (Dckt. No. 28). Instead, he changes the subject. He focuses on his allegations that Defendants verbally and physically harassed him. *See id.* at 4. That's beside the point. The harassment might be relevant to a discrimination claim, but it has no bearing on his claim for differential pay.

Heckenbach relies on the fact that the Illinois Military Leave of Absence Act requires differential pay. *Id.* at 4–5. Again, that's the statute that governed during the period in question. The text of the statute required differential pay during training, *see* 5 ILCS 325/1(a) (repealed 2019), and during active duty, *see id.* at § 1(b). Like that statute, the current Illinois statute requires differential pay, too. The text is straightforward: "Differential compensation shall be paid to all forms of active service except active service without pay." *See* 330 ILCS 61/1-15(b).

That language sinks, rather than supports, Heckenbach's argument. No comparable language appears in the federal statute. The USERRA does not mention differential pay, let alone require public entities to pay it. The text of the state statute expressly requires differential pay, but the text of the federal statute does not. If anything, the foothold for differential pay in the state statute exposes the fact that there is no toehold for differential pay in the federal statute.

Heckenbach tries to press the state statute into service, and shoehorn state law into federal law. He points out that other public entities, like the Chicago Police Department, calculate differential pay the same way that he does. *Id.* at 5. So, in his view, "Defendants'

12

repeated refusals to comply with state law pay requirements violates [sic] USERRA's anti-discrimination provisions." *Id.* He cites no authority.

A violation of state law does not necessarily mean that there is a violation of federal law. Heckenbach points to no language in the federal statute that incorporates state law or makes a violation of state law a violation of the USERRA, too. There is no statutory bootstrap.

Illinois is free to grant members of the armed forces more benefits than federal law. The "USERRA establishes a floor, not a ceiling, for the . . . benefits of those it protects." *See* 20 C.F.R. § 1002.7(a). Although the federal statute supersedes any state law that limits its protections, it also allows "any Federal or State law" to build upon its foundation and provide additional rights. *See id.* at §§ 1002.7(b), (c); *see also* 38 U.S.C. § 4302. So the existence of a state claim does not mean that there is a federal claim, too. State law can grant more rights than federal law.

Again, Heckenbach can bring a claim for differential pay under state law. And he did just that in Count IV. *See* Cplt. ¶ 133 (seeking "differential pay" under Illinois law). But the USERRA does not create a federal right to differential pay, so the motion for judgment on the pleadings on Count I is granted. He has a claim for differential pay – he simply doesn't have a *federal* claim for differential pay.

**II.    Defamation Per Se (Count V)**

Heckenbach brings a defamation claim, too. He claims that Defendants Kaderabek and Wilson made false statements and disparaged his character to the Army Reserve. *Id.* at ¶¶ 140–147. He also claims that the District should be held responsible for the defamatory statements by its employees. *Id.* at ¶ 142.

To plead defamation under Illinois law, Heckenbach must plausibly allege that: (1) Defendants made a false statement about him; (2) publication of the statement was not privileged; and (3) Heckenbach was damaged as a result. *See Stevens v. Shelton*, 2019 WL 1239784, at *9 (N.D. Ill. 2019); *Cox v. Calumet Pub. Sch. Dist. 132*, 180 F. Supp. 3d 556, 563 (N.D. Ill. 2016) (citing *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003)). A statement is defamatory *per se* "if the words impute that a person lacks integrity in performing his job." *Goldberg v. Brooks*, 409 Ill. App. 3d 106, 110, 350 Ill. Dec. 601, 948 N.E.2d 1108 (2011) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d 558, 580, 304 Ill. Dec. 369, 852 N.E.2d 825 (2006)).

The District and the individual Defendants argue that they are immune from liability under the Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq.* Section 2-107 of the Tort Immunity Act gives public entities blanket immunity against defamation claims. "A local public entity is not liable for injury caused by any action of its employees that is libelous or slanderous or for the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." *See* 745 ILCS 10/2-107. The statute includes a fire protection district in its definition of a "local public entity." *Id.* at 10/1-206.

Under the plain language of the statute, the District enjoys immunity from Heckenbach's defamation claim. The text covers "libelous or slanderous" statements, and thus covers claims for defamation. *Id.*; *see also Tacket v. Delco Remy Div. of Gen. Motors Corp.*, 937 F.2d 1201, 1204 (7th Cir. 1991) ("[D]efamation, defined as holding a person up to ridicule, scorn or contempt, is comprised of two related torts: libel and slander.") (internal citation omitted); *Quinn v. Mine*, 2016 IL App (1st) 143327-U, ¶ 3 (2016) ("[D]efamation is a tort that may be

14

spoken or written communication and [] these two forms of communication are commonly known as slander and libel.").

"Section 2-107, on its face, immunizes public entities [] from liability in defamation suits." *Vasquez v. Will County Sheriff's Office*, 2019 WL 4189477, at *4 (N.D. Ill. 2019); *see also Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001) (noting that a local public entity "may not be sued for the allegedly defamatory remarks"); *Turner v. City of Chicago Bd. of Educ.*, 2018 WL 3218706, at *6 (N.D. Ill. 2018); *Villagrana v. Village of Oswego*, 2005 WL 2322808, at *4 (N.D. Ill. 2005); *Ramos v. City of Peru*, 333 Ill. App. 3d 75, 80, 266 Ill. Dec. 622, 775 Ill. App. 3d 75 (2002) ("A plain reading of section 2-107 confirms" that "defamation . . . claims [are] barred by the Tort Immunity Act.").

The Tort Immunity Act also grants immunity to employees of a local public entity in certain circumstances. The statute provides that a "public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." *See* 745 ILCS 10/2-210.

The claim must involve an injury caused by "negligent misrepresentation" or the "provision of information." *Id.* Courts construe the statute to cover defamation claims, presumably relying on the broad statutory phrase "provision of information." *Id.*; *see Stevens v. Shelton*, 2019 WL 1239784, at *10 (N.D. Ill. 2019) ("Section 2-210 of the Tort Immunity Act confers broad immunity upon municipal employees accused of defamation"); *Parker v. Dart*, 2018 WL 6981063, at *2 (N.D. Ill. 2018) ("It is well established that the Illinois Tort Immunity Act applies to defamation claims like that here.") (citing *Goldberg v. Brooks*, 409 Ill. App. 3d 106, 111, 350 Ill. Dec. 601, 948 N.E.2d 1108 (2011)); *Robertson v. Lofton*, 2013 WL 5796780,

at *8 (N.D. Ill. 2013) ("It follows that under the Tort Immunity Act, [a school principal] is not liable for providing information that was defamatory.").

Section 2-210 provides "broad protection to public employees acting within the scope of their employment." *See Goldberg*, 409 Ill. App. 3d at 111. "[E]ven if a statement is defamatory, under Illinois law, the defendants would have immunity for their statements made within the scope of their authority." *Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 861 (7th Cir. 1999). So the key question is whether Defendants Kaderabek and Wilson disparaged Heckenbach while acting within the scope of their official duties. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001).

The complaint squarely alleges that Kaderabek and Wilson acted within the scope of their employment when they made the defamatory statements. Heckenbach expressly alleges in Count V that "Individual Defendants were working as agents of their employer within the scope of their employment and their employer is vicariously liable for the malfeasance of its employees." *See* Cplt. ¶ 142.

That conclusion is consistent with the granular facts. The complaint alleges that Defendants contacted the Army Reserve to complain about Heckenbach's failure to give notice about his military training. *Id.* at ¶¶ 82–88. They did so, the complaint alleges, to advance the interests of "his civilian public employer." *Id.* at ¶ 88. That is, they complained about Heckenbach's work disruptions in their capacity as his superiors in the Fire Department. Managing schedules in the Fire Department, including Heckenbach's schedule, was a core part of their jobs. *Id.* at ¶¶ 28–30; *see also id.* at ¶¶ 13, 14, 19, 46, 47, 58, 61, 64, 66 (describing Defendants' control over the Fire Department and Heckenbach's work schedule).

16

The complaint contains no facts suggesting that Kaderabek and Wilson acted outside the scope of their employment. Heckenbach does not muster any such argument in his response brief, either. He does not deny that Defendants acted within the scope of their employment.

"[T]he case law is clear that Section 2-210 provides absolute immunity." *Stevens v. Shelton*, 2019 WL 1239784, at *10 (N.D. Ill. 2019). Even Heckenbach's allegation that Defendants' "conduct was willful, wanton, malicious, and . . . made with actual malice" doesn't save the day. *See* Cplt. ¶ 145. "Absolute immunity cannot be 'overcome by a showing of improper motivation or knowledge of the statement's falsity, including malice.'" *Horwitz*, 260 F.3d at 618 (quoting *Klug*, 197 F.3d at 861). Defendants "enjoy[] absolute immunity under Section 2-210 of the Tort Immunity Act, without regard to [their] motivations." *Stevens*, 2019 WL 1239784, at *10.

Heckenbach's only response is that immunity is an affirmative defense. *See* Pl.'s Resp., at 5–6 (Dckt. No. 28). That is true, but it makes no difference. A defendant can advance an affirmative defense in a motion for judgment on the pleadings if the complaint itself establishes the defense. The "proper way to seek a dismissal based on an affirmative defense under most circumstances is not to move to dismiss under Rule 12(b)(6) for failure to state a claim. Rather, the defendant should answer and then move under Rule 12(c) for judgment on the pleadings." *See Burton v. Ghosh*, 961 F.3d 960, 964–65 (7th Cir. 2020); *see also Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (stating that a Rule 12(c) motion is the "more appropriate way to address an affirmative defense"); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1367 (3d ed. 2020). "[A] complaint that alleges an impenetrable defense to what would otherwise be a good claim should be dismissed (on proper motion) under Rule 12(c)." *Richards v. Mitcheff*, 696 F.3d 635, 637–38 (7th Cir.

17

2012). Entering judgment now is not premature – it is an efficient way to dispose of a claim that was doomed to fail.

The complaint carves its own exit from the courthouse. Heckenbach alleges that Defendants are employees of a public entity, and defamed his character when acting within the scope of their employment. The Tort Immunity Act gives Defendants absolute immunity for that type of claim. The Court grants Defendants' motion for judgment on the pleadings on the defamation claim (Count V).

## Conclusion

The Court grants Defendants' motion for judgment on the pleadings on Counts I and V (Dckt. No. 20). Counts I and V are dismissed with prejudice.

Date: September 28, 2020

Steven C. Seeger
United States District Judge